Filed 3/20/15  P. v. Wong CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064689 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE318915) |
| MARK ALLEN WONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson; John M. Thompson, Judges.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mark Wong of multiple lewd act offenses against his two minor daughters, with true findings that he engaged in substantial sexual conduct with the two

girls.  The court imposed a sentence of 75 years to life.  On appeal, Wong contends:  (1) the court erred in denying his motion for self-representation; and (2) the judgment must be reversed because the court posed questions to a prosecution witness (one of Wong's daughters).  These contentions are without merit.  We affirm.

FACTUAL AND PROCEDURAL SUMMARY

Wong raised two of his daughters as a single parent; their mother died when the youngest was an infant.  In February 2012, when the daughters were about 11 and 13, the younger daughter (D2) told a social worker at her elementary school that her father had sexually molested her a few days earlier.  After an investigation it was discovered that Wong had been molesting the girls for many years.

At trial, both girls testified about details of the abuse.[1]  D2 said the molestation had occurred at least once a week for years and included digital penetration.  Wong once held her down on the floor and put his penis into (or on) her anus, causing extreme pain and resulting in her throwing up and feeling burning on her bottom.  She testified about details and dates of various other incidents.

The older daughter (D1) was extremely emotional and cried during most of her testimony.  But she described that Wong had molested her numerous times from kindergarten through seventh grade, and provided some specifics.  According to her

---

[1]     Because Wong does not challenge the sufficiency of the evidence to support the jury's findings, we need not detail the testimony here.  We have reviewed the entire record and are familiar with the evidence presented, as graphically described in the Attorney General's appellate brief.

testimony, the molestations included Wong touching her vagina with his hand, mouth, and penis.

Wong's former wife (the girls' former stepmother) and his former girlfriend also testified. The girls had not disclosed the abuse to these women. But the former girlfriend recalled that Wong had once badgered D1 because he thought neighbors were questioning her about being touched inappropriately. The former girlfriend also recalled Wong making statements about the girls' genitalia (when they were preteens), and admitting he had "rubbed" one girl's "private part" over her clothing. Both women said they terminated their relationships with Wong because of his alcohol abuse.

A forensic interviewer testified about behaviors common among children who have been the victims of sexual abuse, including delayed reporting, minimization of the extent or frequency of the abuse, incremental disclosure, and accommodation of the abuse.

A sexual assault examination of D2 revealed evidence of a laceration or abrasion, and some bruising. These findings could be consistent with the reported sexual abuse, but were not necessarily evidence of the abuse.

Wong did not testify or present any affirmative evidence. During closing argument, his counsel emphasized the lack of physical evidence supporting the charges. Defense counsel also suggested the daughters had falsely accused Wong because one daughter was angry over her cell phone being taken away and both girls were "tired" of living with their father because he had a "drinking problem" and they moved frequently.

3

Based on the evidence presented, the jury found Wong guilty of the 11 charged counts of committing a lewd act upon a child. (Pen. Code, § 288a.) As to each girl, the counts covered the periods: (1) January 1, 2010 through February 20, 2012; (2) August 1, 2009 through December 31, 2010; and (3) January 1, 2004 through March 1, 2006. On each count, the jury found Wong had substantial sexual conduct with a child under 14 years, and that he committed the offense against more than one victim. (Pen. Code, §§ 1203.066, subd. (a)(8), 667.61, subds. (b), (c), (e).)

DISCUSSION

I. *Denial of Self-Representation Motion*

About two months before trial was scheduled to begin, Wong requested permission to represent himself. After taking the motion under consideration, the court (Judge John Thompson) denied the motion based on its conclusion that Wong would engage in "unacceptably disruptive" behavior during trial and this conduct would preclude a fair trial. The court based its factual conclusion on its review of the preliminary hearing transcript and its own observations of Wong at pretrial proceedings.

Wong contends the court's denial of his motion violated his constitutional self-representation right. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).) In evaluating this contention, we first summarize Wong's conduct at the preliminary hearing, and then set forth the additional facts before the court when it ruled on Wong's motion. We then describe the court's ruling and the reasons given for the ruling. Lastly, we discuss the applicable legal principles and explain our conclusion that the court did not abuse its discretion in denying the *Faretta* motion.

4

A. *Preliminary Hearing*

In August 2012, Judge Lantz Lewis presided over Wong's preliminary hearing. D2 (age 12) was the first witness to testify. As she was being sworn in, defendant loudly said a word ("Raven") that appeared to startle D2. D2 began crying and had to be taken outside. The court and the bailiff admonished defendant not to "speak audibly." Defendant apologized. After talking with D2, the prosecutor told the court that D2 was now asking whether her grandmother could sit next to her as a support person. As the court was ruling on this request, Wong volunteered "There's no proof. I don't understand why we're here." When the court attempted to address this statement, Wong interrupted again.

At that point, defense counsel (Marissa Remiker) asked to institute proceedings under Penal Code section 1368 to determine whether Wong was competent to stand trial. When Wong kept talking, denying he had committed any criminal acts and indicating that his daughter's accusations were "over a cell phone," the court ordered him taken out of the courtroom. The court stated: "This is intentionally acting out in the presence of the first witness," and ordered the parties to take a five-minute "cooling-off period."

After the recess, Wong was brought back into the courtroom, and the court stated that after Wong was ordered not to talk audibly, he began speaking "in a very loud voice" that was "very disruptive." The court made clear it would not tolerate another outburst. Wong assured the court that he could comply with this directive.

Defense counsel then expressed concern that Wong was not capable of assisting in his defense "because of his somewhat delusional behavior, his sudden outbursts, his

5

inability to control himself sometimes, and his somewhat hostility towards me." She said his behavior appears to be the result of a form of mental illness: "I think there are times that Mr. Wong is perfectly willing to speak with me, is rational, understands the nature of what is going on, is able to speak with me clearly, professionally, and then within five minutes, this sudden outburst occurs. This was something that was completely unexpected. We had talked about the proceedings, not to speak. I was reassured. I was completely blown away that this behavior would even occur. [¶] I received repetitive messages, almost escalating in somewhat delusional behavior, and that is my concern, Your Honor. Quite frankly, they [have] escalate[d] in terms of more accusatory."

After Wong responded by assuring the court he understood the proceedings, the court held a brief *Marsden*[2] hearing, during which Wong expressed a willingness to continue to be represented by his current defense counsel. The court thereafter denied the Penal Code section 1368 motion, finding the evidence did not show Wong's incompetency, and stated Wong "has apologized to the court and has indicated he will be communicating with this attorney quietly."

During the remaining portion of D2's testimony, Wong abided by the court's admonition. However, during D1's testimony, defendant again made very loud and intimidating comments, which appeared to substantially frighten his daughter. These comments came just as D1 was testifying about a particularly difficult incident:

"Q When he touched your front private with his mouth, did he do it over your clothes or under your clothes?

_____

2 *People v. Marsden* (1970) 2 Cal.3d 118.

6

"A    Under.

"The Defendant:  Why don't we talk about how [the girls' aunt] molested [D2]?  I never said anything bad about—I never have.  I never said anything.  They're not going to divide us.

"The Court:  Mr. Wong.  [¶]  Remove him from the courtroom.

"The Defendant:  They're not going to say that my daughters—I never said anything bad about my daughters, and I'm not going to allow the court to break us up.  I love you girls.  [The girls' aunt]?  Tell them how [the aunt] molested [D2].

"(The defendant leaves the courtroom.)

"The Court:  What we're going to do for a moment, if it's okay, [D1], I'm going to ask you to step outside just for a second.  But I need to talk to the attorneys just for a moment, [D1].  It won't be long.

"(The witness leaves the courtroom.)

"The Court:  Counsel, my observations are such that the statements of Mr. Wong are intended to intimidate the witness.  He was loud.  He did not respond to the bailiff's request to stop.  He didn't respond to my request to stop.  Counsel, Ms. Remiker, attempted to get him to stop.  It had a dramatic effect on the witness.  I had warned him if there was another outburst that he would be removed.  So he has been removed.  [¶]  Ms. Remiker, would you like to add anything to the record?

"Ms. Remiker:  No.

"The Court:  Anything from the People?

"[Prosecutor]:  No, thank you, Your Honor.

"The Court:  And I'm going to ask you, if you would, just to have [D1] step back in."

"[Prosecutor]:  Thank you.  [¶]  Your Honor, may she have a moment?  She's just composing herself."

7

For her remaining testimony, D1 was more hesitant and her answers were primarily limited to one-word answers. She was not sure of the answers to many of the questions. At times, the court and counsel could not hear her answers.

After the prosecution completed its case and defense counsel indicated Wong would not be presenting any affirmative evidence, the court stated it wanted to place on the record its observations about the events that occurred regarding Wong's conduct:

> "The Court: . . . . My observations were that as the first witness, [D2], entered the courtroom, she was either sworn or about to be sworn, Mr. Wong, in a very loud and aggressive voice, started communicating, and it appeared the communications were in part directed towards her. My observations were that she immediately lost her composure, turned away, and seemed stunned. [¶] I admonished Mr. Wong to stop. The bailiff admonished him and approached him, and I believe Ms. Remiker admonished him as well. He would not cease his communication and was excluded at that point from the courtroom. [¶] Ms. Remiker, this may not be consistent with what you observed, and if you would like to correct the record or add something, now would be the time to do that.

> "Ms. Remiker: I don't know if his tone necessarily was aggressive. It was extremely loud. I do agree with the Court that he did address—was addressing specifically his daughter while we were all present selling hello and other things and some type of a nickname or something that I never heard him say or referenced at all in the police report. I wouldn't necessarily have characterized it as aggressive. But I do agree that it was very loud.

> "The Court: Would the People like to add anything to the record or correct my summary of what I believed occurred?

> "[Prosecutor]: Your Honor, I'll echo what the Court said later in his comments about Mr. Wong's comments to [D1], that while they may not have been overtly aggressive, they were, in their nature, meant to intimidate, and I believe the statements made to [D2] when she walked in the courtroom were those in nature as well. They were meant to intimidate her, whether psychologically. It may not have been overtly aggressive or threatening in their nature, but

8

psychologically, they were meant to intimidate, both the minor witnesses in the courtroom."

The court then held Wong to answer various lewd act charges.

### B. *Wong's September 10 Letters to Court*

The next month on September 10, Judge Lewis received a letter from Wong in which Wong acknowledged he had given his word he would not speak out at the preliminary hearing, but that he had lost control during the hearing. Wong said: "While my speaking up and out was not angry nor intense as you noted verbally, it was wrong. I would like to hold myself accountable for that. [¶] I sincerely apologize for speaking out of line. You are a reasonable person and gave me a fa[ir] shake." But Wong attached to this letter a five-page handwritten letter containing his rambling assertions denying that he molested his girls, proclaiming his relationship with his daughters was strong and positive, asserting that he raised happy daughters with whom he had a loving relationship, and blaming others for the charges.

### C. Marsden *and* Faretta *Hearings*

Two months later, Wong made a *Marsden* motion for substitution of counsel, and Judge Thompson presided over the hearing. During the hearing, Judge Thompson indicated he was familiar with the case based on his rulings on pretrial motions and had "been involved in the matter throughout." After allowing Wong a lengthy period to discuss the reasons for his dissatisfaction with his counsel, Judge Thompson stated Wong's issues appeared to involve primarily disagreements over evidentiary matters, but asked Remiker to respond. Remiker then discussed the various issues raised by Wong's

motion; noted Wong's failure to cooperate on various levels; and briefly described Wong's misbehavior during the preliminary hearing and the fact that he was twice physically removed from the proceeding because of his misconduct.

After denying the *Marsden* motion, the court asked whether Remiker was aware of Wong's two letters to the court (the "apology" letter and the five-page letter). The court said it was important for Remiker to review the second letter because it could be harmful to Wong's interests. While Remiker was stating that she intended to obtain a copy, Wong interrupted, saying "I'm going to keep writing letters if that's the only way that I can be heard. If you have to lock me up for 135 years, you go ahead and do it, but I'm innocent. [¶] . . . [¶] . . . I'll be heard one way or another." Wong then stated that he wanted to "go pro per" because he did not want to be represented by Remiker. The court responded that Wong had a right to request to be self-represented, but would need to fill out a written waiver form. The court noted that such motions are only "rare[ly] . . . denied," but Wong should discuss the form with Remiker to ensure he understood the consequences.

At a continued hearing later that day, the court said it had received Wong's completed *Faretta* waiver form, but that it remained concerned with Wong's "disruptiveness" and wanted to continue the hearing one week to conduct its own legal research on the court's authority to consider Wong's in-court misbehavior when ruling on the *Faretta* motion. The court said it had the "opportunity to speak extensively with Mr. Wong" regarding the *Marsden* issues and these discussions were relevant to the court's assessment of Wong's ability to represent himself. The court also noted it had "tremendous reservations, for the lack of a better term, of Mr. Wong representing himself

10

and . . . cross-examining his daughters who have made these allegations," but acknowledged this concern did not appear to be a proper basis to deny the motion.

The court held the continued hearing one week later. At the outset of the hearing, the court stated it would deny Wong's self-representation motion. The court explained it had "an opportunity to review the preliminary hearing transcript in the case [and] the applicable . . . law in the matter." The court stated that "[h]aving had an opportunity to review the preliminary hearing transcript, the numerous outbursts, and difficulties that were created during that particular hearing, *there is nothing to suggest to me Mr. Wong's courtroom demeanor would change under a self-representation status*, and his request is denied." (Italics added.)

Wong requested permission to speak, but the court stated he was still represented by counsel and he should obtain his counsel's advice before speaking in court. Wong ignored this admonition, and requested another *Marsden* hearing because he was not "able to present the entire list of reasons that I would like to fire my attorney." The court stated that Wong's *Marsden* motion had already been heard and denied, and the court was not going to hold another hearing on the same motion. The court confirmed the December 26 trial date.

Later that day, the court issued a six-page written order explaining its denial of Wong's *Faretta* motion. In the order, the court detailed the applicable legal principles and cited federal and state authority providing that although a defendant has an " 'absolute' " right to self-representation, a trial court has discretion to deny this right if the defendant engages in " ' "serious and obstructionist misconduct" ' " *and* the

11

circumstances show this conduct will continue.  (See, e.g., *McKaskle v. Wiggins* (1984) 465 U.S. 168; *People v. Welch* (1999) 20 Cal.4th 701 (*Welch*).)  Applying this rule, the court discussed in detail Wong's conduct during the preliminary hearing, including his "intimidat[ion]" of the child witnesses, the damaging effect his conduct had on the witnesses, and Wong's inability or unwillingness to control himself despite being admonished and despite giving assurance that he will not further engage in these behaviors.  The court concluded:

> "Based on a review of the record; the nature of the case; the Defendant's prior outbursts, which the court during the preliminary examination found were meant to intimidate the minor victim witnesses; the effect the outbursts had on the victims; the Defendant's inability to comply with the court's order to not disrupt the proceedings; and this court's observations of the Defendant during the court proceedings, this court finds that Defendant will not conform his conduct to the rules of procedure and courtroom protocol, and that his self-representation would be unacceptably disruptive.  The record shows that Defendant is unwilling to follow courtroom protocol after repeated admonishments and his assurance to the court that he would and could do so."

Shortly after, Wong filed a new *Marsden* motion.  At the trial readiness conference, the court granted the motion without additional argument.  The court stated: "[B]ased upon the current status of this case, irreconcilable differences, for the lack of a better term, have arisen between Mr. Wong and Ms. Remiker.  I believe it is in everyone's best interest at this point to grant the *Marsden* [motion]."  Trial was continued six months to provide Wong's substitute counsel sufficient time to prepare.

12

D. *Legal Principles*

A criminal defendant has the constitutional right to forego the constitutional guarantee of the assistance of counsel and to represent himself at trial. (*Faretta, supra*, 422 U.S. at pp. 817-818.) However, this right is " 'not absolute.' " (*People v. Butler* (2009) 47 Cal.4th 814, 825.) Among other limits, a defendant's *Faretta* right may be denied or terminated if the defendant's " 'deliberate . . . or obstructive behavior' threatens to subvert 'the core concept of a trial' . . . or to compromise the court's ability to conduct a fair trial . . . ." (*People v. Carson* (2005) 35 Cal.4th 1, 10 (*Carson*); *Welch, supra*, 20 Cal.4th at pp. 734-735.)

In determining whether a defendant's disruptive conduct will interfere with a fair trial, "[e]ach case must be evaluated in its own context [and] on its own facts." (*Carson, supra*, 35 Cal.4th at p. 10.) But California courts have identified certain factors that are of particular importance in this analysis. First, a defendant's conduct constituting witness intimidation provides a strong basis for denying the *Faretta* right. (*Carson, supra*, 35 Cal.4th at p. 9.) A court's finding the defendant has engaged or is likely to engage in witness intimidation precludes self-representation because "witness intimidation . . . by its very nature compromises the factfinding process and constitutes a quintessential 'subversion of the core concept of a trial.' " (*Ibid.*) Other relevant factors include: (1) the availability of alternative procedures for addressing or preventing the problem; (2) the likelihood that the misconduct will affect the fairness of the trial; (3) the extent to which the defendant has been admonished to refrain from the behavior; and (4) the extent to which the defendant intended to disrupt the proceedings. (*Id*. at pp. 10-11.)

13

Under these rules, the "likely, not the actual, effect of the misconduct should be the primary consideration." (*Carson, supra*, 35 Cal.4th at p. 10.) Thus, a court may deny a defendant's self-representation request based on the defendant's pretrial misconduct even if the misconduct did not yet "result in [an actual] disruption of the trial . . . ." (*Ibid.*) It would be a "nonsensical and needless waste of scarce judicial resources to proceed to trial when . . . defendant has shown by his conduct during pretrial proceedings that he is unable to conform to procedural rules and protocol." (*People v. Watts* (2009) 173 Cal.App.4th 621, 630.)

A trial court "possesses much discretion" in "deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*Welch, supra*, 20 Cal.4th at p. 735; accord, *Carson, supra*, 35 Cal.4th at p. 12.) The court's "exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' " (*Welch, supra*, 20 Cal.4th at p. 735.) The "extent of a defendant's disruptive behavior may not be fully evident from the cold record, and . . . the trial court . . . is in the best position to judge defendant's demeanor." (*Ibid.*) Accordingly, a reviewing court must "accord due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination [or denial] of *Faretta* rights is necessary to maintain the fairness of the proceedings." (*Carson, supra*, 35 Cal.4th at p. 12.)

E. *Analysis*

The court did not abuse its discretion in this case. Putting together Wong's misconduct at the preliminary hearing with his subsequent statements and conduct, Judge Thompson had a meaningful basis to conclude that if Wong was permitted to represent himself, he would continue his disruptive and intimidating conduct at trial.

First, the record shows Wong engaged in substantial witness intimidation at the preliminary hearing, resulting in his twice being physically removed from the courtroom. This conduct occurred *after* being admonished by his counsel, the court, and the bailiff and *after* Wong repeatedly assured the court he would abide by the rules. At the conclusion of the hearing, Judge Lewis made a specific finding that Wong engaged in this conduct with the intent to intimidate his daughters and prevent their testifying about his sexual abuse. This finding was supported by the record. Wong's misconduct appears to have been timed to have its strongest effect—when D2 first came to the stand and when D1 was recounting his oral sexual abuse. The record shows Wong was successful in achieving this desired result. Each girl lost her composure and broke down after hearing his very loud and aggressive comments directed to them, which appeared to include some form of a coded message to each daughter. Wong had been their sole caregiver for much of their lives, and the girls understandably were upset and frightened and had intense emotional reactions to his courtroom behavior.

In addition to reviewing the preliminary hearing transcript, Judge Thompson observed Wong during pretrial proceedings and at the *Marsden* hearing and had the full opportunity to assess whether it was likely that he would repeat his prior misconduct at

15

trial. At the *Marsden* hearing, Wong at times interrupted the court and counsel and stated he would continue writing letters and be heard "one way or another." Additionally, although he sent an apology letter to Judge Lewis, Wong attached to that letter a lengthy and rambling narrative repeating certain of his comments made at the preliminary hearing and reflecting his anger and frustration regarding his daughters' accusations, which he claimed ignore the "natural love and care that exudes between us." Viewing his conduct and letters together, the court could reasonably conclude that Wong had no true remorse for his prior misconduct and did not intend to abide by his assurances that he would refrain from harassing and intimidating his daughters while they were on the witness stand.

Wong argues the court abused its discretion because it improperly focused solely on his actions at the preliminary hearing. The argument is factually unsupported. The court's order shows the court was aware of the applicable legal principles and that it was required to consider whether Wong would "conform his conduct to the rules of procedure and courtroom protocol" *at trial*. The court specifically stated that in reaching its conclusion that Wong could not do so, it relied on its own "observations of the Defendant during court proceedings." Although Wong argues that the court should have concluded that his subsequent conduct "belies any conclusion [he] would remain so disruptive that he could not represent himself," the court had a reasonable basis to reach a different factual conclusion. The trial judge had the opportunity to view first hand Wong's attitude, verbal tone, facial expressions, and body language, and determine that his outward compliance at the hearings (when he was represented by counsel) did not reflect

16

a sufficient change in attitude and behavior that showed he had the ability or willingness to maintain self-control, particularly when the girls were testifying in front of him. The court had a substantial opportunity to interact with Wong and these observations gave the court insight into Wong's willingness and ability to control himself, and whether Wong was likely to repeat his disruptive conduct at trial—factors that this court is unable to fully evaluate on a "cold record." (*Welch, supra*, 20 Cal.4th at p. 735.)

Based on the court's observations, the court could reasonably conclude that although many of Wong's statements at the *Marsden* hearing appeared to be polite and under control, these outward manifestations of his conduct were merely a superficial cover for Wong's frustration and inability or unwillingness to control himself when his daughters testified about details of the claimed sexual abuse. Although a reasonable trial judge could have assessed the situation differently, the court did not clearly abuse its discretion by concluding that it was likely Wong's disruptive and intimidating conduct would be repeated at trial.

We also find unhelpful Wong's focus on the fact that the trial record shows he did not in fact engage in disruptive conduct at trial. We review the propriety of the court's ruling at the time it was made, and not based on later events. Moreover, after the jury verdict, Wong made statements to the court again suggesting that he did not believe he did anything wrong at the preliminary hearing and that he "wish[ed]" at trial he "would have been able to [have] some type of interaction between [my daughters] and I."

Wong's reliance on *People v. Superior Court* (*George*) (1994) 24 Cal.App.4th 350 is misplaced. In *George*, the trial court denied the defendant's motion to represent

17

himself on the ground that he is a security risk and sought self-representation only to acquire jail privileges. (*Id.* at p. 353.) The People petitioned for a writ of mandate, arguing the denial was not supported by applicable law and could trigger a second trial if a reviewing court later concluded the trial court committed *Faretta* error. (*Id.* at p. 352.) This court granted the petition and ordered the trial court to conduct a hearing to provide the defendant an opportunity to waive his self-representation right with full knowledge of the probable custodial restrictions that will be imposed based on his security risk. (*Id.* at p. 354.) We reasoned the court "improperly created a criterion of 'extreme dangerousness' to deny [the defendant] his absolute right of self-representation. . . . There is simply no authority to deny a defendant the right of self-representation because the defendant poses a real or perceived threat or harbors an ulterior motive." (*Ibid.*) We explained that although the court had discretion to place security restrictions to protect the safety of persons in the courtroom, physical restrictions on a defendant (if determined to be necessary) do not preclude self-representation. (*Id.* at p. 355.)

In this case, the court did not deny Wong's motion based on its belief that Wong presented a security risk or had *previously* intimidated the witnesses. The court instead denied the motion based on its conclusion that Wong was likely to continue to be disruptive and engage in witness intimidation, and that this conduct would interfere with the core integrity of the trial. This is a proper ground for denial of the *Faretta* right under current California Supreme Court authority. (See *Carson, supra*, 35 Cal.4th at pp. 7-12; *People v. Jenkins* (2000) 22 Cal.4th 900, 962-963; *Welch, supra*, 20 Cal.4th at pp. 734-735.)

18

## II. *Court's Questions to Prosecution Witness*

Wong contends the court erred in asking questions to D1 at the end of her testimony.

### A. *Background*

When the attorneys concluded their examination of D1, the court asked several questions clarifying the locations in which the claimed abuse occurred:

"The Court:  All right, I do have a question . . . .  The touching that you described, did that all happen in San Diego?  And when I say San Diego, I mean El Cajon, La Mesa, South Bay?

"D1:  No.

"The Court:  No.  Did it happen other places?

"D1:  Yes.

"The Court:  How many times did he touch you while you were living in San Diego with his penis?

"D1:  I am not sure.

"The Court:  More than once?

"D1:  Yes.

"The Court:  More than twice?

"D1:  Yes.

"The Court:  Okay.  How many times did he touch you when you were living in San Diego where he touched you with his hands on your private part?

"D1:  I don't know.

"The Court:  More than once?

19

"D1: Yes.

"The Court: More than twice?

"D1: Yes.

"The Court: And how many times did he touch you with his mouth on your private part while you were living in San Diego?

"D1: I don't know.

"The Court: More than once?

"D1: Yes.

"The Court: More than twice?

"D1: Yes."

The court then asked counsel if they had any further questions as a result of the court's questions, and neither counsel did.

### B. *Analysis*

Wong contends the court erred in questioning D1.

Wong forfeited the contention by failing to object to the questions. (See *People v. Cook* (2006) 39 Cal.4th 566, 598 (*Cook*); *People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*); *People v. Hines* (1997) 15 Cal.4th 997, 1041; *People v. Corrigan* (1957) 48 Cal.2d 551, 556 ["judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred"].)

Further, there is no merit to Wong's contention because the court's questioning did not constitute error.

A trial judge has " ' " 'the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he [or she] believes [the questioning] may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " ' " (*Harris, supra*, 37 Cal.4th at p. 350, citations omitted; accord, *Cook, supra*, 39 Cal.4th at p. 597.) "The court's questioning must be ' "temperate, nonargumentative, and scrupulously fair" ' [citation], and it must not convey to the jury the court's opinion of the witness's credibility." (*Cook, supra*, 39 Cal.4th at p. 597.) The court should not become an advocate for either party.

The trial court's questions did not exceed the scope of its authority to ensure a proper trial record. The questions were straightforward and open-ended and did not suggest a correct answer or an opinion on D1's credibility. The questions did not show bias toward the prosecution, and were brief and to the point. The prosecutor had already elicited evidence supporting the alleged charges. In asking the additional questions, the court sought information regarding where each of the alleged lewd acts took place—facts that may have been difficult for the jury to discern because D1 had been crying through most of her testimony. The court sought clarifying information regarding whether Wong had inappropriately touched D1 in San Diego County as opposed to in Orange County, where the family lived at one point. The only new fact elicited was D1's testimony that Wong touched her vagina with his penis more than twice. Previous questions by counsel elicited only that appellant touched her with his penis more than once. But this did not

21

affect the verdict because Wong was charged with touching D1 lewdly with his penis only two times, not three.

At the conclusion of the trial, the court instructed the jury that it should not "take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be" and that the jury's role was to decide the facts based only on the evidence presented in the courtroom. These instructions reminded the jury that the trial court's role was limited to an impartial presiding officer, and that any conduct was not designed to favor either side. (*People v. Cook, supra*, 39 Cal.4th at p. 598.) We are required to presume the jury understood and followed these instructions. (See *Harris, supra*, 37 Cal.4th at p. 350.)

Finally, even assuming the judge's questions were inappropriate, the questions were not prejudicial. The questions were brief and straightforward, obviously seeking to clarify D1's testimony regarding the number of times the alleged abuse occurred and the county in which the abuse took place. There were no additional facts elicited that would have changed the outcome of the verdict. Any slight indication the judge found the girls' testimony credible would not have altered the jury verdict. The evidence was strong that Wong sexually abused these two girls. Although the evidence consisted primarily of their own testimony, their candid descriptions of Wong's sexual misconduct provided powerful evidentiary support that they had been victims of their father's abuse. D1's testimony was not as precise as D2's testimony because she was crying during most of her testimony, but corroborating evidence from D2 and from Wong's previous girlfriend supported that D1 had also been sexually abused by defendant.

22

DISPOSITION

Judgment affirmed.

                                                          HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McINTYRE, J.